## *Ex parte* W. J. WILSON.

No. A-1403.　Opinion Filed December 15, 1911.

(119 Pac. 596.)

**INTOXICATING LIQUORS — Constitutionality of Statute — Police Power.** Section 4, c. 70, Session Laws 1911, which provides that it shall be unlawful for any person to have or keep in excess of one quart of spirituous, vinous, fermented or malt liquors, or any imitation thereof, or substitute therefor, or in any manner permit any other person to have or keep any such liquors, etc., was not enacted within the reasonable exercise of the police power, and is therefore unconstitutional and void.

(Syllabus by the Court.)

Application by W. J. Wilson for writ of *habeas corpus.* Writ allowed, and petitioner discharged.

*Johnson & McGill* and *Chas. E. McPherren,* for petitioner.

*Smith C. Matson* and *E. G. Spilman,* Asst. Attys. Gen. (*Andrew Wood,* of counsel), for respondent.

ARMSTRONG, J.　This is an application for a writ of *habeas corpus* brought by petitioner to secure his discharge from

the custody of the sheriff of Carter county, held on a charge of having violated section 4, c. 70, Sess. Laws of 1911, by having in his possession three quarts of alcohol at his place of business in Ardmore.

The agreed statement of facts is as follows:

"First, that the defendant is now and has been for a long time engaged in the livery business on South Washington street in the city of Ardmore, Okla., and that in the office of said livery stable defendant had in his possession on the day and dates alleged in the information 3 quarts of alcohol shipped to him from Ft. Worth, Tex., which he claimed was for his own use. Second, that the affiant, Dew Braziel, is and was at the time a policeman of the city of Ardmore, and found this liquor in the possession of the defendant Wilson, as stated above, and that the defendant stated to him at the time that he had the same for his own use, and not for any unlawful purpose. Third, that the above and foregoing is all the evidence the state has in said cause. Fourth, that the arrest of the defendant and his commitment to jail in default of bond was because he had violated section 4 of chapter 70 of the Session Laws of the State of Oklahoma, enacted and approved March 11, 1911."

The particular section of the prohibitory law under which this prosecution was instituted is as follows:

"Sec. 4. It shall be unlawful for any person to have or keep in excess of one quart of spirituous, vinous, fermented or malt liquors, or any imitation thereof, or substitute therefor; or in any manner permit any other person to have or keep, any spirituous, vinous, fermented or malt liquors, or any imitation thereof, or substitute therefor; or any liquors or compounds of any kind or description whatsoever, whether medicated or not which contains as much as one-half of one per centum of alcohol, measured by volume, and which is capable of being used as a beverage, except preparations compounded by any licensed pharmacist, the sale of which would not subject him to the payment of the special tax required by the laws. of the United States; upon, in, or about his place of business, or any place of amusement or recreation, or any public resort, or any club room, whether such liquors be intended for personal use of the person so having and keeping the same or not; provided, however, that the foregoing provision of this section shall not apply to bonded apothecaries, druggists or pharmacists as to alcohol purchased

by them pursuant to the rules and regulations promulgated by the Governor in accordance with the provisions of this act. Provided, further, that this section shall not be construed in any way to legalize the keeping of such liquors for an unlawful purpose. A violation of any provision of this section shall be a misdemeanor, and shall be punished by a fine of not less than fifty dollars ($50.00) nor more than five hundred dollars ($500.00) and by imprisonment for not less than thirty days nor more than six months."

The propositions raised by petition in this case have been exhaustively briefed by both sides. Counsel for petitioner contend that the provisions of section 4, c. 70, of the Session Laws of Oklahoma, 1911, quoted in full, *supra,* contravene the fourteenth amendment to the Constitution of the United States, and section 7 of article 2 of the Constitution of the state of Oklahoma; and, secondly, that the said provision is not a reasonable exercise of the police power of the state, and is for that reason void; and, thirdly, that said provision is in contravention of section 8, art. 1, of the Constitution of the United States as an interference with and attempt to regulate foreign commerce.

Section 1 of article 14 of the Constitution of the United States is as follows:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States, and of the states wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law."

Section 7 of article 2 of the Constitution of the state of Oklahoma is as follows:

"No person shall be deprived of life, liberty or property without due process of law."

That portion of section 8, art. 1, of the Constitution of the United States relative to interstate commerce, is as follows:

"The Congress shall have power—to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

It is an old and well-settled rule, and one which has been followed since the establishment of appellate courts in this country, that a court will not declare a law to be unconstitutional unless the conflict between the Constitution and the law be clear and plain. The rule is stated by Chief Justice Marshall in the case of *Fletcher v. Peck,* as far back as 1810, reported in 6 Cranch, 87, 3 L. Ed. 162, in the following language:

"The question whether a law be void for its repugnancy to the Constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

The rule is declared by this court in an opinion by Doyle, Judge, in the case of *McCord v. State,* 2 Okla. Cr. 231, 101 Pac. 286, as follows:

"It is a fundamental rule that legislative acts shall not be declared void by the courts if by any reasonable construction thereof such result can be avoided. If, by limitation upon its general terms, the same can be fairly construed, and so applied as to bring the statute within the Constitution and thus save it from being in conflict therewith, such limitation and construction should be adopted."

The question here raised, while new in this jurisdiction, is not a new one to the courts. Identical questions and questions involving the identical principle have been determined in many states, and by the Supreme Court of the United States.

The Supreme Court of West Virginia in 1889, in the case of *State v. Gilman,* 33 W. Va. 146, 10 S. E. 283, 6 L. R. A. 847, had under consideration a statute which made it an offense to keep intoxicating liquors in possession for another. We quote the following from the opinion:

"This indictment is framed under the provisions of section 1, c. 32, Code 1887, and is in the precise language of the statute. It is in legal form, and, as no extrinsic facts were shown to invalidate the finding of it, I think the motion to quash was properly overruled.

"The said statute was amended by chapter 29, Acts of 1887, and then, for the first time, the words 'or solicit or receive orders for, *or keep in his possession for another,*' were made a part of the statute. From the facts proved, it is apparent the conviction in this case much be sustained, if it is done at all, under that provision which I have italicized, '*keep in his possession for another.*' It will be observed that this provision has no reference to the intent or purpose for which the liquor is kept in possession, but it denounces as a crime the simple fact that the liquor is kept in possession for another, however innocent the act, or commendable the purpose. Has the Legislature of this state the constitutional power to make such an act a crime?

"The fourteenth amendment to the Constitution of the United States declares: 'No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.' And the same amendment makes all persons born or naturalized in the United States citizens thereof. It is conceded that the 'privileges and immunities' here protected are such only as are in their nature fundamental; such as belong of right to the citizens of all free governments, and which have at all times been enjoyed by the citizens of the several states of the Union, from the time of their becoming free, independent, and sovereign. What these fundamental rights are, it is not easy to enumerate; the courts preferring not to describe and define them in a general classification, but to decide each case as it may arise. The following, however, have been held to be embraced among them: 'Protection by the government; the enjoyment of life and liberty with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject to such restraints as the government may justly prescribe for the general good of the whole.' Washington, J., in *Corfield v. Coryell,* 4 Wash. C. C. 380, Fed. Cas. No. 3,230; *Conner v. Elliott,* 18 How. 591, 15 L. Ed. 497; *In re Parrott* (C. C.) 6 Sawy. 349, 1 Fed. 481, 6 Myer, Fed. Dec. sec. 1000; *Landing Co. v. Slaughter House Co.,* 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585. These are inalienable and indefeasible rights, which no man, or set of men, by even the largest majority, can take from the citizen. They are absolute and inherent in the people,

and all free governments must recognize and respect them. Therefore it is incumbent upon the courts to give to the constitutional provisions which guarantee them a liberal construction, and to hold inoperative and void all statutes which attempt to destroy or interfere with them. Cooley, Const. Lim. (35) 44. It can hardly be questioned that the right to possess property is one of these rights, and that that right embraces the privilege of a citizen to keep in his possession property for another. It is not denied that the keeping of property which is injurious to the lives, health, or comfort of all persons may be prohibited under the police power.

"The maxim, '*Sic utere tuo ut alienum non laedas*,' being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others. But it does not follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exercise of the police power of the state; and much less is such the case when the statute is merely claimed by its defenders to be intended for that purpose. The United States Supreme Court, in its opinion in *Mugler v. Kansas*, says: 'The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.' (123 U. S. 661, 8 Sup. Ct. 273, 31 L. Ed. 205.)

"The keeping of liquors in his possession by a person, whether for himself or for an other, unless he does so for the illegal sale of it, or for some other improper purpose, can by no possibility injure or affect the health, morals, or safety of the public; and therefore the statute prohibiting such keeping in possession is not a legitimate exertion of the police power. It is an abridgement of the privileges and immunities of the citizen without any legal justification, and therefore void."

The same principle is discussed in the case of *Commonwealth v. Campbell*, by the Kentucky Court of Appeals, reported in 133

Ky. 50, 117 S. W. 383, 24 L. R. A. (N. S.) 172, 19 Am. & Eng. Ann. Cas. 159. In this latter case the court was construing a regulation prohibiting the introduction of intoxicating liquor for one's own use. The principle being identical, the case is strongly in point. The authorities are reviewed, and the question is exhaustively discussed. We quote with approval the following from the opinion:

"It will be observed that the warrant issued against the defendant charges him with bringing into the town of Nicholasville spirituous, vinous, or malt liquors, upon his person or as his personal baggage, exceeding a quart in quantity. So far as the warrant is concerned, therefore there is nothing to negative the idea but what the defendant had the liquor for his own use, and for no other purpose. We presume it will not be controverted that, if the council of Nicholasville could limit the quantity of liquor which a person might have in his possession for his own use to a quart, it could prohibit his having in his possession any quantity whatever. We are confronted therefore with the proposition as to whether or not, in this state, it is competent under the police power for any legislative body to prohibit the possession or use of liquor by one for his own necessity and comfort. Broadly stated, the question before us is whether or not it is competent for the Legislature to prohibit a citizen from having in his own possession spirituous liquor for his own use. It will not require any elucidation to show that, if the citizen may be prohibited from having liquor in his possession, he can be prohibited from drinking it, because, of necessity, no one can drink that which he has not in his possession. So that if it is competent for the legislative body of any given city or district, or even the Legislature of the state, to prohibit the citizen from having liquor in his own possession, then a new and more complete way has been discovered for the establishment of total prohibition, not only in any precinct, town, or county, but throughout the state, because, if it is competent to prohibit the citizen from having liquor in his possession, it necessarily follows that he can neither sell nor use it, as it is a physical impossibility to do either without first having had the possession of the interdicted liquor.

"When the constitutional convention was in session, it was confronted with the question of how the use of spirituous liquor should be regulated. There were two forces brought strongly to bear upon the convention: First, there were the Prohibition-

ists, who desired to facilitate and advance in every way the means of banishing liquor from the state; and, on the other hand, there were those who were engaged in the business of manufacturing and selling liquor, who strongly advocated the utmost freedom of the citizen with reference to its use. The convention gave patient and full hearing to both parties to this controversy, and, as a result, formulated a system by which the sale of vinous, spirituous, or malt liquors throughout the state was to be regulated by general laws. By subsection 27 of section 59 of the Constitution, it is provided that the General Assembly shall not pass local or special acts to provide a means of taking the sense of the people of any city, town, district, precinct, or county, whether they wish to authorize, regulate, or prohibit therein the sale of vinous, spirituous, or malt liquors or alter the liquor laws. And by section 61 it is provided that the General Assembly shall, 'by general law, provide a means whereby the sense of the people of any county, city, town, district, or precinct may be taken, as to whether or not spirituous, vinous or malt liquors shall be sold, bartered or loaned therein, or the sale thereof regulated. But nothing herein shall be construed to interfere with or to repeal any law in force relating to the sale or gift of such liquors. All elections on this question may be held on a day other than the regular election days.' Section 154 is as follows: 'The General Assembly shall prescribe such laws as may be necessary for the restriction or prohibition of the sale or gift of spirituous, vinous or malt liquors on election day.' It will thus be . seen that the Constitution prescribes fully the power of the Legislature with reference to the regulation of liquor, the General Assembly is given ample power by general laws to submit to the people the question whether or not any given district shall have prohibition, and by section 154 they are authorized to prohibit the sale or gift of liquor on election days.

"Now, can it be contended with any show of reason that the framers of the Constitution intended to leave the question of the retailing of liquor in a given district to a vote of the majority of the qualified voters in the district, and yet leave it in the power of the Legislature upon its own motion to prohibit the possession of liquor by the citizen? Before the present Constitution, it was competent for the Legislature to prohibit the sale of liquor, by retail in any county, town, or district, without any vote being taken by the citizens or without giving them any voice in the matter; but no one doubts that ,under the present Constitution, it is not competent for the Legislature, without a vote of the citi-

zens, to declare the retailing of liquor in any part of the state unlawful. How vain it would be, then, for the framers· of the Constitution, to thus take from the Legislature the power to regulate the retailing of liquor and place that question within the competency of the qualified voters, and yet leave within the competency of the Legislature the greatest power of prohibiting the citizen either from possessing liquor or using it for his own benefit or comfort. It is self-evident that, if the Legislature may pass a general law prohibiting any citizen from possessing or using liquor in any quantity, this would in itself be the most perfect prohibition law possible, because no man could retail without first having possession of it. We cannot believe that the framers of the Constitution intended to thus carefully take from the Legislature the power to regulate the sale of liquor, and at the same time leave with that department of the state government the greater power of prohibiting the possession or ownership of liquor. * * *

"This history of our state from its beginning shows that there was never even the claim of a right on the part of the Legislature to interfere with the citizen using liquor for his own comfort, provided that in so doing he committed ·no offense against public decency by being intoxicated; and we are of opinion that it never has been within the competency of the Legislature to so restrict the liberty of the citizen, and certainly not since the adoption of the present Constitution. The Bill of Rights, which declares that among the inalienable rights possessed by the citizens is that of seeking and pursuing their safety and happiness, and that the absolute and arbitrary power over the lives, liberty, and property of freemen exists nowhere in a republic, not even in the largest majority, would be but an empty sound if the Legislature could prohibit the citizen the right of owning or drinking liquor, when in so doing he did not offend the laws of decency by being intoxicated in public. Man in his natural state has a right to do whatever he chooses and has the power to do. When he becomes a member of organized society, under governmental regulations, he surrenders, of necessity, all of his natural right, the exercise of which is, or may be, injurious to his fellow citizens. This is the price that he pays for governmental protection, but it is not within the competency of a free government to invade the sanctity of the absolute right of the citizen any further than the direct protection of society requires. Therefore the question of what a man will drink, or eat, or own, provided the rights of others are not invaded, is one which addresses itself

alone to the will of the citizen. It is not within the competency of government to invade the privacy of a citizen's life and regulate his conduct in matters in which he alone is concerned, or to prohibit him any liberty the exercise of which will not directly injure society.

"The difference between the absolute and relative rights of man, and the power of the government with reference thereto, is thus set forth by Blackstone in his Commentaries on the Laws of England: 'The rights of persons considered in their natural capacities are also of two sorts, absolute and relative: Absolute, which are such as appertain and belong to particular men, merely as individuals·or single persons; relative, which are incident to them as members of society, and standing in various relations to each other. The first—that is, absolute rights—will be the subject of the present chapter. By absolute rights of individuals, we mean those which are so in their primary and strictest sense; such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy, whether out of society or in it. But with regard to the absolute duties which man is bound to perform, considered as a mere individual, it is not to be expected that any human municipal law should at all explain or enforce them. For the end and intent of such laws being only to regulate the behavior of mankind, as they are members of society, and stand in various relations to each other, they have consequently no concern with any other but social or relative duties. Let a man therefore be ever so abandoned in his principles, or vicious in his practice, provided he keeps his wickedness to himself, and does not offend against the rules of public decency, he is out of the reach of human laws. But if he makes his vices public, though they be such as seem principally to affect himself (as drunkenness, or the like), they, then become, by the bad example they set, of pernicious effects to society; and therefore it is then the business of human laws to correct them. Here the circumstances of publication is what alters the nature of the case. Public society is a relative duty, and therefore enjoined by our laws; private sobriety is an absolute duty, which, whether it be performed or not, human tribunals can never know; and therefore they can never enforce it by any civil sanction.' · (Book 1, pp. 123, 124.)

"Cooley, in his work on Constitutional Limitations, thus states the rule with reference to sumptuary laws, and the right of the Legislature to enact them: 'In former times sumptuary laws were sometimes passed, and they were even deemed es-

sential in republics to restrain the luxury so fatal to that species of government. But the ideas which suggested such laws are now exploded utterly, and no one would seriously attempt to justify them in the present age. The rights of every man to do what he will with his own, not interfering with the reciprocal rights of others, is accepted among the fundamentals of our laws.' (Pages 549, 550.)

"John Stuart Mill, in his great work on Liberty, says: 'The object of this essay is to assert one very simple principle, as entitled to govern absolutely the dealings of society with the individual in the way of compulsion and control, whether the means used be physical force in the form of legal penalties, or the moral coercion of public opinion. That principle is that the sole end for which mankind are warranted, individually or collectively, in interfering with the liberty of action of any of their numbers is self-protection. That the only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinions of others, to do so would be wise or even right. These are good reasons for remonstrating with him, or reasoning with him, or persuading him, or entreating him, but not for compelling him, or visiting him with any evil, in case he do otherwise. To justify that, the conduct from which it is desired to deter him must be calculated to produce evil to some one else. The only part of the conduct of any one, for which he is amenable to society, is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his own body and mind, the individual is sovereign.' (Pages 22, 23.) And again: 'Secondly, the principle requires liberty of tastes and pursuits; of framing the plan of our life to suit our own character; of doing as we like, subject to such consequences as may follow; without impediment from our fellow creatures, so long as what we do does not harm them, even though they should think our conduct foolish, perverse, or wrong.' (Page 28.)

"In discussing the limits of the authority of society over the individual, our author says: 'Though society is not founded on a contract, and though no good purpose is answered by inventing a contract in order to deduce social obligations from it, every one who receives the protection of society owes a return for

.the benefit, and the fact of living in society renders it indispensable that each should be bound to observe a certain line of conduct towards the rest. This conduct consists: First, in not injuring the interests of one another, or rather certain interests, which, either by express legal provision or by tacit understanding, ought to be considered as rights; and, secondly, in each person's bearing his share (to be fixed on some equitable principle) of the labors and sacrifices incurred for defending the society or its members from injury and molestation. These conditions society is justified in enforcing, at all costs to those who endeavor to withhold fulfillment. Nor is this all that society may do. The acts of an individual may not be hurtful to others, or wanting in due consideration for their welfare, without going the length of violating any of their constituted rights. The offender may then be justly punished by opinion, though not by law. As soon as any part of a person's conduct affects prejudicially the interests of others, society has jurisdiction over it, and the question whether the general welfare will or will not be promoted by interfering with it becomes open to discussion. But there is no room for entertaining any such question when a person's conduct affects the interests of no persons besides himself, or needs not affect them unless they like (all persons concerned being of full age, and the ordinary amount of understanding). In all such cases there should be perfect freedom, legal and social, to do the action and stand the consequences.' (Pages 144, 145, and 146.) Again: 'In like manner when a person disables himself, by conduct purely self-regarding, from the performance of some definite duty incumbent on him to the public, he is guilty of a social offense. No person ought to be punished simply for being drunk; but a soldier or a policeman should be punished for being drunk on duty. Whenever, in short, there is a definite damage, or a definite risk of damage, either to an individual or to the public, the case is taken out of the province of liberty, and placed in that of morality or law.' (Pages 157, 158.)

"Black, in his work on Intoxicating Liquors (page 50, par. 38), says: 'But it is justly held that a provision in such a law that no person, without a state license, shall "keep in his possession, for another, spirituous liquors," is unconstitutional and void. "The keeping of liquors in his possession by a person, whether for himself or for another, unless he does so for the illegal sale of it, or for some other improper purpose, can by no possibility injure or affect the health, morals, or safety of the public, and therefore the statute prohibiting such keeping

in possession is not a legitimate exertion of the police power. It is an abridgement of the privileges and immunities of the citizen without any legal justification, and therefore void." '

"In the case of *State v. Gilman,* 33 W. Va. 146, 10 S. E. 283, 6 L. R. A. 847, the Supreme Court of West Virginia held that a statute prohibiting the citizen to keep in his possession, for another, spirituous liquors, is unconstitutional and void. It is from the opinion in this case that Black adopted the quotation given above. The principle is rested upon the broad proposition that every person has a right to keep or use liquor for his own benefit, or to keep it for another, provided in so doing he does not attempt to sell it or otherwise use it so as to injure the public.

"In the case of *State v. Williams,* 146 N. C. 618, 61 S. E. 61, 17 L. R. A. (N. S.) 299, it was held by the Supreme Court of North Carolina that a statute forbidding one under penalty to carry into a county, where the sale of intoxicating liquors is prohibited, more than a half gallon of such liquor on any day, deprives him of his constitutional property right in case he has no intent to sell it. In the opinion in this case the question is most learnedly discussed in all of its phases, and the principles which we have announced is upheld after a review of all the authorities.

"In discussing the question before us we have assumed that the general council of the city of Nicholasville has been clothed with all the authority to enforce what is called the police power which the General Assembly possesses, and also that the city of Nicholasville has by regular proceedings prohibited the sale of liquor within its boundary; but with these presumptions we have not been able to uphold the warrant in this case. It will be observed that the defendant is not charged with having the liquor in his possession for the purpose of selling it, or even giving it to another. The sole charge against him is that he had it in his possession, and therefore we must presume that he had it there for a lawful purpose if he could so hold it. Nothing that we have said herein is in derogation of the power of the state under the Constitution to regulate the sale of liquor, or any other use of it which in itself is inimical to the public health, morals, or safety; but, as spirituous liquor is a legitimate subject of property, its ownership and possession cannot be denied when that ownership and possession is not in itself injurious to the public. The right to use liquor for one's own comfort, if the use is without direct injury to the public, is one of the citizen's natural and inalienable rights, guaranteed to him by the Constitution, and can-

not be abridged as long as the absolute power of a majority is limited by our present Constitution. The theory of our government is to allow the largest liberty to the individual commensurate with the public safety, or, as has been otherwise expressed, that government is best which governs the least. Under our institutions there is no room for that inquisitorial and protective spirit which seeks to regulate the conduct of men in matters in themselves indifferent and to make them conform to a standard not of their own choosing, but the choosing of the lawgiver; that inquisitorial and protective spirit which seeks to prescribe what a man shall eat and wear, or drink or think, thus crushing out individuality and insuring Chinese inertia by the enforcement of the use of the Chinese shoe in the matter of the private conduct of mankind. We hold that the police power—vague and wide and undefined as it is—has limits, and in matters such as that we have in hand its utmost frontier is marked by the maxim, 'Sic utere tuo ut alienum non laedas.'"

The Supreme Court of Maine, in discussing a similar proposition, in the case of *Preston et al. v. Drew,* 33 Me. 559, 54 Am. Dec. 641, decided in 1852, uses the following language:

"While the act provides for the seizure and forfeiture of the liquors designed for sale in violation of its provisions, no positive enactment is found that no person shall acquire any property in them. Nor is there any language capable of receiving such a construction as would forbid it. The prohibition to sell them cannot prevent any person from acquiring and possessing them for his own use, without any intention to sell them. Nor can it prevent their transportation from one town or city to another, or through the state, when there is no intention to make sale of them. There is nothing found in the act indicative of an intention to prevent their being property, when thus possessed or used. On the contrary, the act authorizes them to be legally sold and used for certain purposes, and therefore to be the subject of property for such purposes. If they cannot be the subject of property, the town or city agents can have no property in them, nor can they or the town or cities, by any action, obtain redress for their lawless and wanton destruction.

"It is, however, insisted in argument that a person, by the common law, can no more acquire property in spirituous and intoxicating liquors, than he can in obscene publications and prints. There is a clear and marked distinction between them. Such liquors may be applied to useful purposes. 'This is admitted in

the act, by its authorizing their sale for medicinal or mechanical purposes. It is their misuse or abuse alone which occasions the mischief. Obscene publications and prints are in their very nature corrupting, and productive of evil. They are incapable of any use which is not corrupting and injurious to the moral sense.

"Such liquors are also alleged to be a common nuisance, and as such liable to destruction. There is nothing which can be regarded as a nuisance, when considered by itself alone, and separate from its use. It is the improper use or employment of a thing which causes it to become a nuisance. It would be not a little absurd to declare that to be á nuisance, and as such liable to be abated and destroyed, which the act allows to be sold and purchased as an article u-?ful for medicinal and mechanical purposes."

The Supreme Court of Illinois, in the case of *Sullivan v. City of Oneida,* reported in 61 Ill. 242, had under consideration an ordinance similar in purpose and involving the principle here under discussion, and held such provision invalid. Among other things, the court says:

"A frequent recurrence to certain fundamental principles is essential to the preservation of good government, and to the security of the liberty and personal rights of the citizen. Every man has the right to acquire and protect his property; to be secure against unreasonable searches and seizures; to a fair trial according to the course of the common law, before he can be deprived of life, liberty, or property; and in all criminal prosecutions the right to be heard, to demand the nature and cause of the accusation against him, and to meet the witnesses face to face."

And again:

"Spirituous liquors, ale and beer, are property as much so as money or lands. They are chattels; are articles of consumption and of commerce. The ordinance recognizes them as property and directs their sale on execution, and permits druggists to keep them. Their abuse may be restrained, and punishment inflicted upon those who sell them to the injury of others. They may, as well as other chattels, come under the designation of nuisance, and, to a certain extent, lose their quality as property; but they cannot, *per se,* lose their quality as property."

And again:

"The Legislature may change the law and increase the pre-

sumptions of guilt.  It may, to a certain extent, make acts evidence of an unlawful intent which had before been innocent.  It may declare the possession of certain articles of property, on account of their highly dangerous character, unlawful.  But such laws must always have proper safeguards for the security of private rights."

And again: ·

"There can be no justification for the search which is authorized by the charter.  Possession is declared to be evidence of unlawful intent; hence the possession is unlawful.  Unlawful possession justifies the search and seizure; therefore mere possession justifies the search.  Without actual sale—without the overt act, without even intent, in fact to violate the law—the sanctity of the domestic circle is violated by an odious search.  For cause so trivial the privacy of the citizen cannot be invaded and his house ransacked from cellar to garret.  If this can be done, the rampart which the Constitution has built up to secure the hearthstone from rude intrusion is an effectual defense no longer.  The search provided for is odious and unreasonable, and in conflict with the Declaration of Rights."

While the question before this court does not directly involve the search and seizure provisions of the prohibitory statute, yet the provision under consideration, if valid, would subject our citizens to the search of their offices, places of business, or homes, and subject their property to seizure in the same manner as was done in the Illinois case.  No reasonable theory can be advanced to sustain any such high-handed action.

An examination of the prohibitory statutes of this state in connection with that of the state of North Carolina discloses the fact that the North Carolina statutes is the fountain from which our statute flows; and no one can fairly contend that the Supreme Court of North Carolina has not gone as far as any state in the American Union in upholding the strictest prohibitory statutes.

In the case of *State v. Williams,* 146 N. C. 618, 61 S. E. 61, 17 L. R. A. (N. S.) 299, that court construes what appears to be the original of the statute here under consideration.  It says:

"That the Constitution is the 'law of the land,' in the sense that no act of either department of the government, which vio-

lates its provisions or exceeds its powers, can be enforced to deprive the citizen of his life, liberty, or property, is a fundamental truth. To deny it is to assert that constitutional government is a failure, and liberty regulated by law has no abiding place in our political system. The Constitution is, of necessity as well as the declared will of the people, the supreme law; and in no proper legal sense can any act of either department of the government, which violates its provisions or exceeds the powers delegated, be the law. To state the same proposition affirmatively: An act of the Legislature which finds no support in the Constitution, or is not an exercise of the power conferred therein, imposes no duty, deprives the citizen of no right, and subjects him to no penalty. This is a 'first principle, the recognition of which is essential to the preservation of liberty.' 'If the Constitution prescribes one rule and the law another and different rule, it is the duty of courts to declare that the Constitution, and not the law, governs the case before them for judgment.' (*Scott v. Sanford,* 19 How. 628, 15 L. Ed. 69.) 'An unconstitutional law is void, and is as no law. An offense created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment.' (*Ex parte Siebold,* 100 U. S. 376, 25 L. Ed. 717.) 'The limitations imposed by our constitutional law upon the action of the governments, both state and national, are essential to the preservation of public and private rights, notwithstanding the representative character of our political institutions.' (*Hurtado v. Cal.,* 110 U. S. 536, 4 Sup. Ct. 111, 292, 28 L. Ed. 232)."

In discussing the rights of a citizen situated as the petitioner in the case at bar, the court, continuing, says:

"It is the right of the citizen, when called to the bar of the court, to appeal to the Constitution, and demand that the court declare whether the statute which he is charged with violating be 'the law of the land.' To make this right of any value or protection to the citizen, it must be the duty of the court to declare its judgment thereon. To deny this is to keep the promise to the ear and break it to the heart—to make of noneffect the declaration that 'ours is a government of law, and not of men.' 'It will be an evil day for American liberty if the theory of a government outside of the supreme law of the land finds lodgment in our constitutional jurisprudence. No higher duty rests upon this court than to exert its full authority to prevent all vio-

lations of the principles of the Constitution.' (Harlan, J., in *Downes v. Bidwell,* 182 U. S. 382, 21 Sup. Ct. 823, 45 L. Ed. 1088.)"

In connection with this discussion of the sacred duty of a court to act absolutely without regard to fear or favor, we deem it proper to quote the language of Furman, Presiding Judge, in *Titsworth v. State,* 2 Okla. Cr. 271, 101 Pac. 289, as follows:

"Whatever the personal views of the members of this court may be upon this question, it must be remembered that it is our sworn duty to decide this, as well as all other questions, according to the law as it is, whether we like it or not. The judge who would attempt to defeat or misconstrue the law of the land, simply because he did not personally approve it, or who, Pontius Pilate like, would attempt to keep his fingers upon the public pulse and allow public clamor to cause him to swerve one iota from a correct declaration of the law, is utterly unworthy of the confidence and respect of rightly thinking people, and establishes precedents which will result in the subversion of our institutions and the ultimate defeat and destruction of justice itself. The true judge maintains the integrity of his character, and enforces the law as it is, without regard to his personal feelings or any consequences which may ensue to himself, let his conduct please or displease whosoever it may. If he does not do this, he is a coward and a perjurer, and a traitor, and a disgrace to the position which he occupies, a curse to the people among whom he lives, and should receive the contempt of all honest people."

Furman, Presiding Judge, in the case, *supra,* draws attention to the fact that the "law of the land" not only means the law of our own state, but also the Constitution of our state (which is violated by the act under discussion, as well as is the Constitution of the United States), and, above all, the Constitution of the United States, in the following language:

"The state of Oklahoma is an inseparable part of the federal Union, and the Constitution of the United States is the supreme law of the land. (Constitution, art. 1, sec. 1 [Bunn's Ed. sec. 2]). Article 6 of the Constitution of the United States contains the following: 'This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in

every state shall be bound thereby; anything in the Constitution or laws of any state to the contrary notwithstanding.'"

Touching the reluctance with which the courts declare an act of the Legislature to be unconstitutional, the Supreme Court of North Carolina, in the above-quoted case of *State v. Williams,* uses the following language:

"However much we may desire to sustain the acts of the Legislature as to a co-ordinate department of the government, we may not, without being recreant to the duty imposed upon us and the rights of the citizen, refuse to declare firmly and fearlessly the issue which he makes with the government."

That the Supreme Court of the state of North Carolina has traveled as far, if not farther, than any other judicial tribunal in the United States to sustain prohibitory legislation, is evidenced by the following from the case *supra*:

"The Legislature, in the exercise of the police power, may, by appropriate enactment, regulate, and, if they deem it conducive to the public health, morals, peace, or safety, entirely prohibit the manufacture and sale of intoxicating liquors. For the purpose of making effective such legislation, they may make it criminal for any person to have such liquors in his possession within the territory wherein the sale or gift is prohibited, with intent to sell or give away. They may prescribe or change the rules of evidence by making such possession *prima facie* evidence of a guilty intent. This court has universally sustained legislation of this character.

"In *State v. Dowdy,* 145 N. C. 432, 58 S. E. 1002, we held that a certified copy of the record kept by the collector of internal revenue was competent, not only as evidence but sufficient to sustain a conviction for selling liquor in violation of the statute. (It is evident that North Carolina furnished the pattern for our, on the whole, excellent prohibition laws.) We have endeavored to give full force and effect to the legislation enacted in this state for the suppression of the liquor traffic, resolving, as was our duty, every reasonable doubt regarding its validity in favor of the enactment. This legislation finds its support in the police power vested in the state government. It is exercised primarily by the Legislature, which may adopt any measure within the extent of the power, appropriate and needful, for the protection of the public morals, the public health, or the public safety."

The court calls attention to the fact that there is a limit to the police power, which the courts must, when called upon in a judicial proceeding, ascertain and declare, and quotes Justice Harlan in *Mugler v. Kansas,* 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, as follows:

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exercise of the police power of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. * * * If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of the rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution. *State v. Redmon,* 134 Wis. 89, 114 N. W. 137, 14 L. R. A. (N. S.) 229, 126 Am. St. Rep. 1003."

Relative to the proper limitations upon the police power, the court says:

"Recognizing the difficulty of fixing any definite limitation upon the police power, the courts have refrained from doing more, in cases which have arisen, than inquire whether 'the real purpose of the statute under consideration has a reasonable connection with the public health, welfare, or safety.' *People v. Havnor,* 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707; *People v. Lochner,* 177 N. Y. 145, 69 N. E. 373, 101 Am. St. Rep. 773. The result of the decisions has been well stated in 22 Am. & Eng. Enc. 938: 'In order that a statute or an ordinance may be sustained as an exercise of the police power, the courts must be able to see that the enactment has for its object the prevention of some offense or manifest evil, or the preservation of the public health, safety, morals, or general welfare, and that there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do, in some plain, appreciable, and appropriate manner, tend toward the accomplishment of the object for which the power is exercised."

The Legislature of North Carolina appears to be the first legislative body to enact a statute as broad and sweeping as the one now under discussion (the statute so enacted was held to be unconstitutional); Oklahoma's Legislature is the second and last

to do so. In view of the provisions of our state Constitution, the Constitution of the United States, and the long, unbroken line of adverse decisions in states having constitutional provisions similar to ours, where a similar statute has been enacted, we cannot bring ourselves to believe that the Legislature of this state expected this court to be recreant to its duty to declare the law without fear or favor.

In calling attention to the fact that the enactment of a statute similar to the one under consideration in the case at bar was without precedent, the Supreme Court of North Carolina in this case used the following language:

"Beginning with the Maine liquor law, the statutes and Codes of every state in the Union abound with every conceivable variety of legislation having for its objects the regulation, restriction, or prohibition of the liquor traffic. The courts, both state and federal, have been called upon to construe, interpret, and pass upon the validity of many of these statutes. They have with remarkable uniformity sustained them, and when of doubtful meaning, given them such interpretation as would suppress the evil and advance the remedy. An unusually careful and diligent examination by the Assistant Attorney General and ourselves fails to discover any statute, either in terms or scope, similar to the one under discussion. While the Legislatures have resorted to many expedients to control, regulate, restrict, and prohibit the manufacture and sale, either in entire states, or counties, towns, cities, or districts, we do not anywhere find any suggestion that the possession of intoxicating liquor, without any unlawful purpose, or carrying it into the territory wherein its sale is prohibited, with no unlawful purpose, is made indictable. While by no means decisive of the power to do so, the fact that no such attempt has been made is worthy of note in seeking the basis of the asserted power."

The court, in the above case, approves the holding of the Supreme Court of Vermont in the case of *Lincoln v. Smith,* 27 Vt. 328, where, in a well-considered opinion, it was held that the Legislature had the power to prohibit the traffic in intoxicating liquor and subject it to seizure, forfeiture, and destruction when kept for that purpose, quoting with approval the following language:

" 'Though there is a prohibition not to sell them, yet we cannot prevent a man from having property in them for his own use without any intention to sell them; and they may be transported through the state where there is no intention to violate the law.' "

In *Austin v. Tenn.,* 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224, it is stated:

"Whatever produce has from time immemorial been recognized by custom or law as a fit subject for barter or sale, particularly if its manufacture has been made the subject of federal regulation and taxation, must, we think, be recognized as a legitimate article of commerce, although it may, to a certain extent, be within the police power of the state."

In the *License Cases,* 5 How. 504, 12 L. Ed. 256, Taney, Chief Justice, used the following language:

"But spirits and distilled liquor are universally admitted to be subjects of ownership and property."

Our own Supreme Court, in the case of *Gulf, C. & S. F. Ry. Co. et al. v. State ex rel. Caldwell,* 28 Okla. 754, 116 Pac. 176, determines the property right in intoxicating liquors in a well-reasoned and well-supported opinion by Justice Williams.

The Supreme Court of North Carolina, in the case of *State v. Williams, supra,* cites and quotes with approval *State v. Gilman, supra,* and discusses *Ex parte Mon Luck,* 29 Ore. 421, 44 Pac. 693, 32 L. R. A. 738, 54 Am. St. Rep. 804, which is one of the cases relied upon by the Attorney General in the case at bar. In this case, Bean, Chief Justice, says:

"Opium is an active poison and has no legitimate use except for medical purposes; but it is frequently used to produce a kind of intoxication by smoking or eating."

The writer of the opinion in this Oregon case, in considering the case of *State v. Gilman, supra,* and, no doubt, many other cases supporting the doctrine of *State v. Gilman,* took pains to differentiate the Mon Luck case, which he was considering, from the long, unbroken line of cases dealing with intoxicating liquors, by using the following language:

"But the principles of these cases has no application here. It is a matter of common knowledge that intoxicating liquors are produced principally for sale and consumption as a beverage; and so common has been their manufacturing and use for this purpose that they are regarded by some courts (Chief Justice Bean should have said by all the courts from the Supreme Court of the United States down) as legitimate articles of property, the possession of which neither produces nor threatens any harm to the public. But the use of opium for any purpose than as permitted in this act has no place in the common experience or habits of the people of this country."

The Supreme Court of Alabama, in the case of *Eidge v. City of Bessemer,* reported in 164 Ala. 599, 51 South. 246, 26 L. R. A. (N. S.) 394, determines this identical question. We quote from the opinion as follows:

"We indulge one further quotation from high authority, as succinctly stating the limitation upon the Legislature in the exercise of the police power: 'It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exercise of the police power of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. * * * If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to these objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution. *Mugler v. Kansas,* 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205. Such are the limitations upon the Legislature in the exercise of the police power which must be observed in the consideration of this case. There is no attack here upon any statutory enactment of the Legislature. But the principles to be gathered from the cases considered applies with equal force, of course, to municipal ordinances, which must be enacted in pursuance of a delegated legislative authority.

"Municipal corporations in this state have power to adopt ordinances, not inconsistent with the laws of the state, to provide for the safety, preserve the health, promote the prosperity, and improve morals, order, comfort, and convenience of the inhabitants. Code 1907, sec. 1251. It must be conceded that they may pass ordinances in accord with the general prohibition law of the state, ordinances to prevent evasions thereof by trick, artifice, or subterfuge, and ordinances making it an offense to keep in-

toxicating liquors and beverages in any place, public or private, with intent to sell or dispose of them in violation of law; all such being in consonance with the law and policy of the state, and fairly implied in the broad grant of powers enumerated. The ordinance in question does not make an offense against the municipality of those acts which are denounced by the law of the state; that is to. say, it does not prohibit the sale of intoxicating liquors, nor does it create the separate and distinct offense of having or keeping liquors and intoxicating beverages with the unlawful intent. It can be justified only, if at all, on the ground that it sustains some reasonable relation to the prohibition law in the way of preventing evasions of that law by trick, artifice, or subterfuge under guise of which that law is violated. But it has no such relation. It undertakes to prohibit the keeping in any quantity and for any purpose, however innocent, of intoxicating liquors and beverages in places which are innocent in themselves. Under the ordinance a keeping with innocent purpose is as much an offense as a keeping with purpose to violate the law. The ordinance is no more to be sustained than if it had said: 'No man shall keep for his own use intoxicating liquors or beverages in any place where any drinks or beverages, though entirely free of alcohol, are sold or kept for sale.'· Certainly if the keeping for one's own use, and with no purpose to violate the law, may be prohibited in such places, the prohibition against keeping without lawful purpose may as well be extended to keeping at any place where men are, many· or few, with result that vinous, spirituous, and malt liquors must indeed be classified with burglar's tools (the keeping of which with innocent purpose, we remark, has never been prohibited), lottery tickets, infected clothing, and diseased animals, and the constitutional and legislative recognition of property rights and personal liberty held for naught."

See, also, *French v. City of Birmingham,* 165 Ala. 669, 51 South. 254; *Dorman v. State,* 34 Ala. 216; *Ex parte Mayor of Florence,* 78 Ala. 419.

In the case of *Vance v. Vandercook Co.,* 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100, the Supreme Court of the United States, in passing on a similar proposition, held certain provisions of the liquor law of South Carolina unconstitutional. The court says:

"It is settled by previous adjudications of this court that the

respective states have plenary power to regulate the sale of intoxicating liquors within their borders, and the scope and extent of such regulations depend solely on the judgment of the law-making power of the states; provided, always, they do not transcend the limits of state authority by invading rights which are secured by the Constitution of the United States, and provided further that the regulations as adopted do not operate a discrimination against the rights of residents or citizens of other states of the Union."

There are many other authorities bearing on this question; but we feel that this opinion has covered sufficient ground to make the position of the court clear. Our research has not disclosed a single case in conflict with the doctrine of the authorities quoted and cited, and none has been called to our attention, although the question has been extensively briefed and presented by the Attorney General's office. The only conclusion that we can legitimately arrive at is that the act in question is not within a reasonable exercise of the police powers of the state—is unconstitutional and void. We may observe, however, that although the law cannot prevent one from having intoxicating liquors in his possession for his own use, yet this court has always held that the possession of an unusual quantity of intoxicating liquors is a circumstance which, together with other competent proof, is admissible against the defendant in the trial of cases involving violations of the prohibitory statute. But such possession alone is insufficient to sustain a conviction.

The writ is allowed, and the petitioner discharged.

FURMAN, P. J., and DOYLE, J., concur.