STATE OF MISSOURI, Respondent, v. WILLIS F. WARD, Appellant, AL JACKSON, Intervenor-Respondent, No. 42010—239 S. W. (2d) 313.

Court en Banc, May 14, 1951.

*Robert N. Jones* for appellant.

*J. E. Taylor,* Attorney General, *Aubrey R. Hammett, Jr.,* and *Hugh P. Williamson,* Assistant Attorneys General, for respondent.

[315] HYDE, J.—Action by the State Supervisor of Liquor Control to declare contraband a motor truck and cargo of intoxicating alcoholic liquors, seized September 8, 1949, under Sec. 4932, R. S. 1939, as amended Laws 1949, p. 325 (Mo. R. S. A. 1950 Pocket Part, p. 110) and to sell the same at public sale. The Court found intervenor Jackson entitled to possession of the truck, as mortgagee, and ordered the liquor forfeited and sold. Defendant has appealed.

This statute and other amendments to the Liquor Control Act were enacted as emergency legislation in Senate Bill 110 by the Sixty-fifth General Assembly and became effective on May 26, 1949. Sec. 4932 provides: "No person shall transport into, within, or through the State of Missouri any intoxicating liquors in quantities larger than five gallons who is not the holder of a license or permit from the Supervisor of Liquor Control of the State of Missouri so to do." It also required a $1000.00 bond from the licensee. Licenses were for one year, from July 1 to June 30, and the fee was $10.00. Defendant procured Liquor Transportation License No. 4 issued July 1, 1949. Sec. 4932 requires that transported liquors "shall be accompanied at all times during transportation by a bill of lading or other memorandum of shipment, showing an exact description of the alcoholic liquors being transported, the name and address of the consignor, the name and address of the consignee, the route to be travelled by such vehicle while in Missouri, and the vehicle transporting such liquors shall not vary from said route." It further provides: "The name of the consignee on such bill of lading or memorandum of shipment shall be the true consignee of the alcoholic beverages being transported and who has previously authorized in writing the shipment of the alcoholic beverages being transported

and *who has a legal right to receive such beverages at the point of destination* shown on the bill of lading or other memorandum of shipment.'' (Emphasis ours.)

Section 4932 also provides: ''Any intoxicating liquor being transported into, within, or through the State of Missouri in knowing and wilful violation of the provisions of this act and the conveyance in which it is being transported shall be deemed contraband and shall be forfeited to the State of Missouri, and the Supervisor of Liquor Control, or any of his agents and Inspectors, and any peace officer of the State of Missouri shall seize any such liquor and the conveyance in which it is being transported as contraband.'' The purpose of this action is to enforce such forfeiture. The trial court found that defendant did not in good faith believe that his consignees had a lawful right to receive the liquor in Oklahoma and declared the liquor to be contraband.

Defendant made from 15 to 20 trips between July 1 and September 8, 1949 with liquor loaded at Cairo, Illinois and delivered to individual consignees at Bartlesville and Tulsa, Oklahoma. Defendant said: ''The arrangement was that I would receive the order and the money at the consignee's place of business, or residence in Oklahoma, place or address that the liquor stamps (federal permit) were at, and proceed then to Cairo to the wholesaler and receive the whiskey there and then transport it.'' These consignees would give defendant a written order (not addressed to anyone, but requesting that a designated number of cases of certain brands of liquor be given to him) and deliver to him the money to pay for it. They paid him from two and a half to three dollars a case for delivering it. At the time he unloaded one load, they would usually give him the next order and the [316] money. On the September trip which ended in seizure, defendant received $14,000.00 from four consignees which he took with their orders to the Southern Wholesale Liquor Company at Cairo. Two of these orders were signed by defendant's father, E. W. Ward. Each of these said: ''Please send me the following merchandise by W. F. Ward;'' and specified the liquor to be sent. The Liquor Company attached to each order a memorandum, dated September 7, 1949, the ones for defendant's father stating: ''Sold to E. W. Ward, Route 2, Box 3, Hwy. 77, S. Bartlesville, Okla.'', and describing the liquor ordered. An invoice, with serial numbers, was attached with a blank affidavit to be signed by the purchaser, stating that he was the holder of a federal permit or stamp in Oklahoma; that all liquors were for consumption outside of Illinois and would not be returned there; and that they would not be sold in any state where Federal Law prohibited sale. Other similar papers showed sales to Brent Clark and L. K. Thresher of Tulsa and Paul Watkins of Bartlesville. Much of this liquor was ''lugged,'' three fifths, six pints or eight half pints in brown paper bags, with crayon

1242

marks to indicate contents. The evidence showed: "That is a practice among bootleggers  *  *  *  a licensed package store, they don't 'lug' whiskey;" they get it in cases.

Defendant contends that the Missouri law was not violated, claiming that the Oklahoma consignees had a legal right to receive defendant's shipment and that there was no showing of defendant's knowledge and wilfulness. Certainly there was substantial evidence to show that these consignees were bootleggers, selling the liquor in violation of the Constitution and laws of Oklahoma. State agents went to Oklahoma to investigate these persons and their addresses. All of these consignees had federal permits as liquor dealers; none of them had ever been issued a license as a registered pharmacist or druggist. Defendant's father's address was a motor court, with a night club, known as Marie's Court. Defendant himself said: "We had a cabin there he used as a storeroom and I unloaded into this cabin." He further testified: "Q. Was your father living down in Bartlesville? A. His business was there. Q. What kind of business? A. Whatever it was I was hauling this load for him to do." One of the Liquor Department agents said defendant stated to him that "his father was interested in this Marie's Court operation there;" and said: "If you boys are ever over at Marie's Court you can stop and get a good drink of whiskey there for fifty cents. *  *  * We always serve straight shots and you can always get a drink at Marie's." Investigation of the other consignees showed that they were all operating from private residences. One of the agents testified without objection that Watkins said he was a bootlegger. During two months, defendant had brought five or six loads to Clark, two to Thresher, and five or six to Watkins. Apparently most of the rest went to his father, who owned a farm near Pineville, Missouri, where defendant lived with his mother. His father was frequently at the farm.

▮▮▮ Defendant has briefed and argued this case as though this liquor belonged to him but the record conclusively shows that this was not true. Proceedings for forfeiture are provided by Sec. 4917, R. S. 1939 as amended by Senate Bill 110 (Laws 1949, p. 322), which provides the action shall be "against the person from whom the property was seized as defendant, and there shall be a rebuttable presumption that said property is the property of the defendant from whom it was seized." However, it further provides for publishing "notice to all persons whom it may concern that said petition has been filed in said court, briefly describing the property seized, the time and circumstances of the seizure, the person from whom seized, and stating that any person claiming any interest in the property may, upon his own request be made a party to the action and assert any claim he may have thereto within thirty days after the publication of said notice"; and that "Any person claiming any

interest in said property may intervene in said action within thirty days after the publication of said notice, setting forth any claim he may have to said [317] property." Thus this is not an action against defendant only, but is in the nature of a proceeding in rem against the liquor and its owners. (See 30 Am. Jur. 551, Sec. 570; 48 C. J. S. 655, Sec. 397.) It is clearly intended that the true owner shall appear and contest the forfeiture; and to prevent it he must prove his own proper conduct, showing that any illegal use of his property "was without his connivance or consent, express or implied." Therefore, more is involved herein than just what defendant believed or did. The required notice was given in this case and the consignees who were the actual owners of this liquor took no action to claim it but made default. Since it was conclusively shown by defendant's own evidence, that he did not own the liquor, the Court could not (on this record) have entered a judgment awarding it to him as owner.

While defendant, no doubt, had the right of possession as against anyone but the state (if it was entitled to condemn) and perhaps had a lien for his carrying charges, nevertheless his right as against the state depends upon the right of the actual owners to receive it in Oklahoma, and his knowledge of their situation. The Twenty-first Amendment to the United States Constitution provides: "Sec. 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The Webb-Kenyon Act (27 U. S. C. A. 122) provides: "The shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State, Territory, or District of the United States, * * * into any other State, Territory, or District of the United States, * * * which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory, or District of the United States, * * * is hereby prohibited." The Constitution of Oklahoma (Art. 1, Sec. 7) prohibits "The manufacture, sale, barter, giving away or otherwise furnishing * * * of intoxicating liquors" except for certain medicinal, industrial or scientific purposes. Any such sale or furnishing of liquor, containing more than 3.2% of alcohol, is made a criminal offense (37 O. S. A. 1) and habitual violation (more than two convictions) is made a felony. (37 O. S. A. 14.) It is also made a criminal offense for any agent of a carrier to deliver any liquors, the sale of which is prohibited (37 O. S. A. 34) ; or for any consignee to receive any such liquors from a carrier. (37 O. S. A. 38.) A permit system is provided (Laws Okla. 1949, p. 273) under

which permits may be obtained from the State Tax Commission, upon execution of a $1000.00 bond for importation of liquor for scientific, sacramental, medicinal or mechanical purposes; and providing: "No permit shall be issued to any person, or for any purpose, or for the importation of any intoxicating liquor, except as specifically authorized."

Oklahoma laws also provide that "The payment of the special tax required of liquor dealers by the United States * * * shall constitute prima facie evidence of an intention to violate the (state's prohibition laws)" (37 O. S. A. 81); and that the keeping in excess of one quart (of liquor containing more than 3.2% alcohol), except by bonded apothecaries, druggists or pharmacists "shall be prima facie evidence of an intention to convey, sell or otherwise dispose of such liquors." (37 O. S. A. 82.) It is also provided that any judge or justice of the peace upon complaint and showing of probable cause that liquor is being sold, shall issue a warrant to any peace officer "commanding him to search the premises described and designated in such complaint and warrant and to seize all such liquor there found." (37 O. S. A. 84.) It is further provided that "All liquors, property or things seized under the provisions of this act shall, upon being adjudicated forfeited to the state, be forthwith destroyed." (37 O. S. A. 90.) Thus it is clear that the Oklahoma laws prohibit all sales of intoxicating [318] liquor by persons such as defendant's consignees; that these consignees had no right to receive, for this purpose, the liquor being transported by defendant; and that it would have been subject to seizure by Oklahoma officers after they did receive it. Defendant argues that Sections 81 and 82 are evidence sections only, citing Menard v. Goltra, 328 Mo. 368, 40 S. W. (2d) 1053, but we consider them only to determine who may legally be liquor dealers in Oklahoma.

Thus it is obvious why these consignees who were the actual owners of this liquor did not appear in this case and claim it; and the Court could properly take into consideration their failure to make any claim, especially since they had been interviewed by the Missouri agents and one of them was defendant's father. It was at least a reasonable inference for the Court to make from all the evidence (as it did) that the purpose for which these shipments were made was for unlawful sale and that defendant knew they were intended for such purpose. In fact, it is hardly reasonable to think that a person, with defendant's knowledge of the consignees' situation and the amount of liquor being delivered to them, would believe anything else. As found by the trial Court: "For two months defendant had hauled about two loads of liquor per week into Oklahoma and delivered it to dwelling houses bearing none of the ordinary indicia of a lawful liquor trade, in quantities sufficient to stock an ordinary saloon, and to some of his customers he had made several such de-

liveries. His compensation for the trip in question was about $800.00, and some of the cargo was 'lugged.' While defendant says he did not know the business of any of his consignees, he surely did know that none of them held himself out as a druggist, hospital, industrial user of alcohol, etc." Of course, defendant's statements to plaintiff's agents (which the Court could properly accept as true) showed that defendant did know that his father was selling the whiskey.

Defendant relies on Johnson v. Yellow Cab Transit Co., (C. C. A. 10th) 137 Fed. (2d) 274, affirmed 321 U. S. 383, 64 S. Ct. 622, 88 L. Ed. 814 as supporting his contention that the consignees had a legal right to receive the shipment. However, the consignees in that case were United States Army officers at Fort Sill and they were to receive the liquor on that Military Reservation, which was under the jurisdiction of the United States and not of Oklahoma. There each officer was receiving a limited amount of liquor for his own use, while here there is substantial evidence (accepted as true by the Court) that the consignees were obtaining this liquor for the purpose of selling it in violation of the laws of Oklahoma. We think it is clear that both state and federal laws made it illegal for them to receive it for that purpose. It is true as defendant contends, and as stated in the principal opinion in the Johnson case, that "mere possession of intoxicating liquor without an intent to sell, barter or give away such liquor does not constitute an offense under the Oklahoma statutes." (See Ex parte Wilson, 6 Okla. Cr. 451, 119 Pac. 596; Morse v. State, 63 Okla. Cr. 445, 77 Pac. (2d) 757.) It is also true the opinion said that if Sections 31 and 32 (making mere possession a crime) was beyond the power of the Oklahoma Legislature, then Section 38 (making receipt of liquor from a carrier a crime) must likewise be beyond the power of the Legislature and unconstitutional. However, the other judge, who concurred in a separate opinion, did not concur on that ground, and the United States Supreme Court did not decide the case on that ground. No decision of the Oklahoma Supreme Court holds that section to be unconstitutional and the dissenting opinion in the Johnson case points out that it has long been enforced and that its constitutionality has never been questioned. In any event, making receipt for the purpose of unlawful sale illegal is surely not beyond the power of the Legislature if possession for the purpose of unlawful sale can properly be made a crime, and that definitely is the law of Oklahoma.

Intent to sell, barter, give away or otherwise furnish is an essential ingredient of the crime of unlawful possession of intoxicating liquor. (Coe v. State, [319] Okla. Cr., 192 Pac. (2d) 291; Stump v. State, Okla Cr., 92 Pac. (2d) 616.) However, in Ex parte Wilson (119 Pac., l. c. 606), holding possession for one's own use cannot be made a crime, the Court said: "We may observe, however, that although the law cannot prevent one from having intoxicating liquors

in his possession for his own use, yet this court has always held that the possession of an unusual quantity of intoxicating liquors is a circumstance which, together with other competent proof, is admissible against the defendant in the trial of cases involving violations of the prohibitory statute." After that decision, the Oklahoma Legislature adopted the "quart law." (37 O. S. A. 82, herein above set out in part.) In upholding a conviction under this law, the Oklahoma Criminal Court of Appeals said, in Thomas v. State, 172 Pac. (2d) 651, l. c. 654: "The evidence revealed that he had in his possession in excess of one quart of intoxicating liquor. No evidence was introduced by defendant. This was prima facie evidence that the possession of the intoxicating liquor was for the purpose of sale, barter or giving away, and was for an unlawful purpose." In a very recent case, Moody v. State, Okla. Cr., 220 Pac. (2d) 297, in holding "the intent with which liquors are possessed is an essential ingredient of the crime," the Court said: "It is not illegal to have the possession of intoxicating liquor in the state of Oklahoma for one's own personal use, irrespective of the quantity which a person might have in his or her possession. Of course the greater the quantity the less likelihood there is that a jury would believe that the liquor was for the personal use of the individual charged with its possession." Thus the quantities that defendant's consignees were receiving were material on the question of the use they were making of them. We hold there was ample support for the Court's finding that the consignees had no legal right to receive the shipments involved and that defendant knew they were intended for an unlawful purpose. Thus, the finding that defendant knowingly and wilfully violated the Missouri Act was fully supported by the evidence.

Defendant further contends the seizure was unlawful, claiming it was the result of a search under compulsion and without warrant or probable cause, citing State v. Jones, 358 Mo. 398, 214 S. W. (2d) 705; State v. Owens, 302 Mo. 348, 259 S. W. 100; and Carroll v. U. S., 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543. The facts shown by the State's evidence were that two of its agents were out checking liquor shipments when they saw defendant driving a 1-1/2 ton truck completely enclosed, without Public Service Commission or other signs on it; and showing only the name E. W. Ward, Pineville, Missouri, in small letters. (It was defendant's father's truck and not the one defendant stated he would use in his application for license.) They followed the truck until it stopped at a filling station. When defendant got out, the agents asked if he was hauling intoxicating liquor. Defendant told them that he was hauling unstamped liquor from Illinois to Oklahoma and inquired if they were with the Department of Liquor Control. He said he had been expecting them to check up on him, that he had his permit, invoices and orders, and asked if they would care to see them. They identified themselves

and examined the papers. They then contacted their supervisor by phone, and at his suggestion asked defendant if he would drive by the prosecuting attorney's office so that he could check his invoices. Defendant agreed to do so and one agent rode with him because he said he did not know the way to the courthouse. Upon arriving there, they checked the load of liquor and the prosecuting attorney informed defendant that he would have to keep the liquor and truck but that he could go.

Defendant was operating under a license from the State, which was not true in the cases he cites. Section 4932, which authorized his license, provides: "The Supervisor of Liquor Control of the State of Missouri and his agents and inspectors, members of the Missouri State Highway Patrol, and every sheriff [320] and deputy sheriff in the State of Missouri may inspect and search any vehicle, with or without a search warrant, which he has probable cause to believe is being used in violation of the terms of this statute." This was a condition of defendant's license and his consent for an inspection of his cargo without a search warrant was implied from his application for and acceptance of a license under this statute. (See 4 C. J. 638, Sec. 394.) We distinguished State v. Owens, supra, (cited by defendant) in a similar situation, in State v. Bennett, 315 Mo. 1267, 288 S. W. 50, holding that by accepting a hunting license defendant there acquired a privilege subject to the restrictions of the statute authorizing it, "one of which was to submit to the inspection and count of the quail in his possession by the game warden;" and that he thereby waived constitutional rights against a search "so far as applicable to the facts in this case." (See also 30 Am. Jur. 325, Sec. 132.) We hold there was probable cause in this case. The agents had been informed by their Supervisor about the many shipments from Cairo to Oklahoma. Defendant told them he was transporting liquor and showed them his papers which indicated shipments to unauthorized liquor dealers in Oklahoma. The agents saw a loaded revolver and loaded rifle in the cab of defendant's truck. The whole situation indicated transportation to consignees for an illegal purpose. (See Carroll v. United States, supra, 45 S. Ct., l. c. 288 and cases cited.) We, therefore, hold that the inspection and search of defendant's truck was proper under the statute.

Defendant further contends that he was induced by the State to transport liquor to Oklahoma and was entrapped by it; and that the State is estopped to profit by seizing the liquor from him. Defendant cites Sorrells v. U. S., 287 U. S. 435, 53 S. Ct. 210, 77 L. Ed. 413. However, the definition of entrapment he quotes from that case is as follows: "Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer." Likewise, in 22 C. J. S. 102, Sec. 45, it is

said: "if an officer of the law or his agent generates in the mind of one who is entirely innocent of any criminal purpose the original intent to commit acts which are in violation of the prohibition statutes, or induces him to do such acts, a conviction is improper. However, it does not constitute an unlawful entrapment merely to afford one an opportunity to violate the law." These authorities show that there can be no defense of entrapment in this case. Defendant bases his contention on the fact that his application for a license stated that he intended to transport liquor to Oklahoma. However, liquor could be legally transported to persons or corporations in Oklahoma who had permits from that state to import it. Section 4932, under which defendant obtained his license, prohibited transportation of liquor to consignees who did not have "a legal right to receive such beverages at the point of destination." This was a condition of defendant's license and instead of being an inducement or instigation to him to carry shipments to such consignees as he served, it was a warning to him not to do so. No defense of entrapment can be made out of these facts. Furthermore, as the above authorities show, entrapment is a defense against a charge of crime and defendant is not being tried here for a criminal offense.

Defendant's claim of estoppel is: "There were conducts, acts, and silence amounting to a representation by the plaintiff in licensing defendant and publicly clearing Oklahoma shipments and plaintiff's silence on its opinion that defendant was operating illegally." Defendant's evidence was that he and others were not stopped from transporting such shipments during July and August 1949 and that the District Supervisor of the Liquor Department in southeast Missouri checked invoices of other persons hauling from Cairo to Oklahoma and permitted them to go ahead; but defendant had never been checked before this seizure. Senate Bill 110, putting these license provisions into effect for the first time, became effective May 26, 1949. A new Supervisor of Liquor Control took office June 18, 1949, and licensing [321] began on July 1st. Perhaps the State did' not commence enforcement as soon as it could have, but defendant was licensed and operating under this law and it was his duty to comply with it. He certainly could obtain no rights to violate it by reason of its non enforcement. Our Constitution (Art. XI, Sec. 3) prohibits the surrender or abridgment of the police power of the State even by act of the Legislature; and the United States Supreme Court has held that "a state cannot estop itself by grant or contract from the exercise of the police power." (Sanitary District of Chicago v. U. S., 266 U. S. 405, 45 S. Ct. 176, 69 L. Ed. 352; see also Missouri v. Illinois, 180 U. S. 208, 21 S. Ct. 331, 45 L. Ed. 497; State ex inf. McKittrick v. American Colony Ins. Co., 336 Mo. 406, 80 S. W. (2d) 876.) Clearly there is no merit in defendant's claim of estoppel.

Defendant finally contends that Senate Bill 110, and Sections 4884, 4917, 4932 as amended thereby, places an unconstitutional burden on interstate commerce. This contention has been fully answered by the United States Supreme Court in Carter v. Commonwealth of Va., 321 U. S. 131, 64 S. Ct. 464, 88 L. Ed. 605, where the same provisions of the Virginia laws were held valid. The Court, citing Duckworth v. Arkansas, 314 U. S. 390, 62 S. Ct. 311, 86 L. Ed. 294, said: "We have recognized that the several states in the absence of Federal legislation may require regulatory licenses for through shipments of liquor in order to guard against violations of their own laws." The Court held that "the state of transit may compel the carrier to furnish information necessary for checking the shipment against unlawful diversion;" and that "a state may require a reasonable bond of one who wishes to engage in interstate trade of a kind dangerous to well-recognized local interests." The Court further said: "It is enough that Virginia could conclude, in the absence of contrary Federal legislation, that she could not safely permit the transportation of liquor through her territory by those who concededly mean to break Federal laws and the laws of a neighboring state. By her ruling she has imposed no substantial clog on whatever cognate rights her sister states may have to determine their own policies regarding intoxicating liquors and to receive alcoholic beverages in interstate commerce, if they so desire." The testimony of the Supervisor of Liquor Control and his agents that, prior to this Act, liquor in transit without Missouri stamps had been diverted and sold in this state, showed the need for such legislation here.

The judgment is affirmed. All concur.