Alan BALLEW, Plaintiff-Appellant,

v.

C. Donald AINSWORTH, Director,
Division of Insurance,
Defendant-Respondent.

No. 45785.

Missouri Court of Appeals,
Eastern District,
Division One.

April 3, 1984.

Motion for Rehearing and/or Transfer
to Supreme Court Denied May 2, 1984.

Application to Transfer Denied
June 19, 1984.

Ernest L. Keathley, St. Louis, for plaintiff-appellant.

Kevin R. Jones, Jefferson City, for defendant-respondent.

STEPHAN, Judge.

This is an appeal from a judgment of the circuit court affirming a decision of the Administrative Hearing Commission (AHC). The case was initiated before the AHC by appellant's filing of two complaints claiming that respondent, Director of the Division of Insurance, had wrongfully refused to issue to appellant licenses to act as agent for two insurance companies. The two complaints were consolidated in the AHC; and, after a hearing, the AHC issued findings of fact, conclusions of law, and decision, upholding the refusal to issue the licenses. We affirm the judgment of the circuit court.

The underlying facts are not the subject of serious contention. Appellant Alan Ballew was a duly licensed agent of Allstate Insurance Company, Allstate Life Company, and Allstate Indemnity for a period of approximately ten months prior to the termination of his agency by Allstate. By letter dated August 13, 1975, Allstate notified the Director of the Division of Insurance that, "this Agent was terminated in the midst of circumstances relative to Section 375.141, Sub-Section 4, 'Demonstrated Lack of Trustworthiness or Competence.'" The letter continued, "As you may know, Alan Ballew was involved in alleged planning of burglaries in the St. Louis area, and has admitted to involvement in such acts. It is for this reason he was terminated from the Allstate Insurance Co." On August 11, 1975, and on August 25, 1975, the Director received applications from Ballew requesting licenses authorizing him to act as agent for two other insurance companies. Both applications were in proper form and accompanied by the required cer-

tification from each insurance company. In letters to Ballew's attorney, the Director of the Division of Insurance stated that each application was refused under authority of § 375.141.2. In each letter, the Director stated that his refusal was "based upon evidence of violations under Section 375.141.1, Paragraph 4 and Paragraph 6, RSMo 1969."[1]

Ballew filed complaints, as contemplated by § 161.302, supra. Following a full evidentiary hearing on the matter as consolidated, the AHC issued findings of fact which include the following (in which Ballew is referred to as "petitioner"):

"The thread of events goes back to Petitioner's first meeting with one Edward Bernard Caplin, continuing from the time of that first meeting to the time of Petitioner's arrest. The factual development of Petitioner's relationship with Caplin is divided into two time periods, the first being the time period before July 2, 1975, and the other being the time period beginning with July 2, 1975, and extending through July 10, 1975.

"The first period began when Petitioner, while working in the Allstate booth at the Jamestown Mall Sears store, received a telephone call from Caplin, inquiring about automobile insurance. Petitioner sold the automobile policy to Caplin and sold policies on two of Caplin's homes and life insurance on Caplin's wife and two of their three children. Caplin also inquired about insurance on an apartment complex which he owned and a retirement pension plan known as a Keough Plan. Petitioner made several attempts to sell the apartment policy and Keough Plan to Caplin between January, 1975, and July, 1975, but he was unsuccessful in those attempts.

"During this period prior to July 2, 1975, while Petitioner was attempting to sell the apartment and Keough Plan policies to Caplin, Caplin took the Petitioner to the office of one Lawrence Mobley. Mobley's office was in a 'bad neighborhood' and located in the back room of the building where they were meeting. While the three men were sitting in Mobley's office, Petitioner drew a diagram of a store known as Trails West Western Store located at 805 Manchester Road, St. Louis County, on which he had written an insurance policy. The three men then discussed details concerning the possibility of burglarizing Trails West.

"The second phase of Petitioner's relationship with Caplin began on July 2, 1975. On that date, Petitioner received a call from Caplin in which Caplin stated that he wanted to write the Keough Plan; that he wanted to introduce Petitioner to two men; and that he wanted Petitioner to bring along a diagram of Trails West. This meeting was to take place at the Steak n' Shake drive-in restaurant at 9009 Riverview Boulevard on Halls Ferry Circle in the City of St. Louis.

"Caplin had met earlier that day with Vincent Stehlin, then a detective, now a sergeant in the Police Department of the City of St. Louis, and William Brosmith, security manager for the Allstate Insurance Company. During the course of the meeting, Caplin called the Petitioner and

---

**1.** The relevant portions of § 375.141, RSMo, 1969, provide:

1. The superintendent may revoke or suspend, for such period as he may determine, any license of any insurance agent, agency or broker if it is determined as provided by sections 161.272 to 161.342, RSMo, that the licensee or applicant has, at any time, or if any insurance agency, the officers, owners or managers thereof have:

   *   *   *   *   *   *

(4) Demonstrated lack of trustworthiness or competence;

   *   *   *   *   *   *

(6) Practiced or aided or abetted in the practice of fraud, forgery, deception, collusion or conspiracy in connection with any insurance transaction;

   *   *   *   *   *   *

2. The superintendent may refuse to issue or renew any license of any insurance agent, agency or broker if he determines that the licensee or applicant has, at any time, or if an insurance agency, the officers, owners or managers thereof have violated any of the provisions set out in subsection 1 of this section.

made arrangements for the meeting at Steak n' Shake.

"Caplin, Stehlin and Brosmith met Petitioner at the Halls Ferry Steak n' Shake at approximately 4:15 p.m. Petitioner left his car and got into Caplin's car. Caplin introduced Stehlin and Brosmith, and identified them as burglars to Petitioner. The discussion that took place at this meeting concerned itself with the possibility of Stehlin and Brosmith participating in a burglary of the Trails West, and also of a residence in Spanish Lake, Missouri, owned by Harry Miller, for which the petitioner had written a Home Owner's Insurance Policy. The Petitioner furnished a rough diagram of Trails West and explained to the others how it could be burglarized, what type of merchandise was inside the store, the fact there was no burglar alarm, and the amount of contents insurance coverage on the store.

"Upon conclusion of their meeting at the Steak n' Shake restaurant, all four men then drove in Caplin's car to the location of the Miller Home. They then returned to the Halls Ferry Steak n' Shake and Petitioner proceeded to work at the Allstate Insurance booth located at the Sears store in Jamestown Mall Shopping Center in North St. Louis County.

"On July 9, 1975, Stehlin and Brosmith met Petitioner where he was working at the Allstate booth, and while standing at the booth, told Petitioner to draw a map of the Miller home, which Petitioner drew when requested to do so. They conducted a conversation with the Petitioner on this occasion at the booth and nearby coffee shop. All three men discussed the details of burglarizing both the Trails West and the Miller home.

"On July 10, Stehlin and Brosmith approached the Petitioner at the Allstate booth and asked him to come out to the car with them because they wanted to show him some 'loot' from the burglary at the Miller home. Petitioner followed and was arrested on a charge of attempted burglary in St. Louis County by one or more police officers of the Police Department of the City of St. Louis. Following his arrest, Petitioner was removed from St. Louis County to the City of St. Louis, without first having been taken before a Magistrate or Circuit Judge of St. Louis County.

"On or about August 1, 1975, Petitioner was indicted by a grand jury presentment and true bill, in which he was charged with two counts of attempted burglary. To this charge, Petitioner entered a plea of not guilty before Division No. 16 of the St. Louis City Circuit Court. The Circuit Court, subsequently, dismissed both counts of that indictment and the State's appeal was dismissed by the Missouri Attorney General."

▮ In his first point, appellant Ballew argues that the trial court erred in affirming the AHC's decision that the Director of Insurance could properly refuse to issue an agent's license under the circumstances of this case. This argument is founded upon the language of § 375.016, RSMo 1969, which provides in part:

"The superintendent *shall* issue a license to any natural person, who is at least eighteen years of age, a resident of this state and has complied with the requirements of section 375.018, authorizing the licensee to act as an insurance agent in respect to any or all insurance contracts as specified in such license, . . ." (Emphasis added.)

That appellant met the age and residence requirements of § 375.016 as well as the requirements of § 375.018, which relate to the form of the application, documentation, examination and fee, is not an issue. Ballew, therefore, contends that the use of the word "shall" reduces the issuance of a license by the Director to a ministerial act, once the other requirements are met. We do not agree. Such a view totally ignores the language of § 375.141-2, set out in the margin, which permits the superintendent (now statutorily referred to as the "director") to refuse to issue a license to an applicant for the same reasons which authorize a suspension or revocation. We note that §§ 375.016 and 375.041 were enacted in essentially their present form as

part of a comprehensive revision of the statutes relating to the insurance industry in 1967. H.C.S.H.B. 262, 74th General Assembly, L.1967, p. 516. Sharing such legislative genesis, the sections are *in pari materia,* and they must be read and construed together. *Bittiker v. State Board of Registration for the Healing Arts,* 404 S.W.2d 402, 406[9] (Mo.App.1966). This obviously could not be done if we were to adopt appellant's view. Harmony between the two sections can be achieved only by reading § 375.016 as requiring the issuance of a license to a qualified applicant, *unless* the director determines that the applicant has "violated any of the provisions set out in subsection 1 of this section." § 375.141–2. When a license is refused under such circumstances, the applicant is authorized by § 161.302 to initiate proceedings in the Administrative Hearing Commission and to have an evidentiary hearing on his qualifications for licensure. The reference in § 375.141–1 to a determination of grounds for revocation or suspension "as provided by sections 161.272 to 161.342," the Administrative Hearing Commission Act, clearly reflects awareness by the General Assembly of the function and purpose of the Commission which it had created two years prior to the revision of § 375.141.[2] It is equally clear that the General Assembly meant for that section to be read in conjunction with the Administrative Hearing Commission Act, which specifically provided for instances in which the Director of the Division of Insurance refused to issue a license. §§ 161.272, 161.302, RSMo 1969. Appellant's argument that, upon his filing of an application in proper form, the Director was without power to do anything but issue the license is without merit.

Appellant's second point is based on his theory that "none of the evidence submitted before the Administrative Hearing Commission showed that appellant practiced or aided or abetted in the practice of a fraud, forgery, deception, collusion or con-

spiracy in connection with an insurance transaction." This is a complaint, in effect, that the evidence would not authorize a finding that appellant was guilty of conduct proscribed by § 375.141–1(6), supra. This evidence included testimony concerning appellant's conference with Bernard Caplin and Lawrence Mobley about the proposed burglary of the Trails West Store and appellant's conferences with Caplin, Stehlin, and Brosmith on the subject of burglarizing the store and the home of Mr. and Mrs. Harry Miller.

Appellant's attack is two pronged: (1) that the evidence failed to show any of the appellant's activities were "in connection with any insurance transaction;" and (2) he could not have entered into a conspiracy with Caplin, detective Stehlin, and security manager Brosmith because none of those three ever intended to carry out the burglaries. We find these arguments unpersuasive.

With respect to the first argument, appellant cites several authorities which define a "transaction," with minor qualifications, as a "business deal" or a "contract." He then argues that the evidence fails to show any misconduct on his part directly related to the formation, performance or discharge of the policies of insurance between Allstate and the Trails West Store and Allstate and Mr. and Mrs. Miller. In support of the second argument, appellant relies on the concept of legal impossibility of a "conspiracy" where there is only one person who has any intention of actually committing a crime. Appellant finds support for this position in the case of *U.S. v. Moss,* 591 F.2d 428, 434 (8th Cir. 1979), where it is said, "Obviously, a man cannot conspire with himself ... The essence of any conspiracy is an agreement between two or more individuals to commit a crime." Aside from the fact that the defense of legal impossibility has been eroded by recent legislative and judicial pronouncements,[3] we need not explore the

**2.** The Administrative Hearing Commission was created by the Regular Session of the Seventy-

Third General Assembly. L.1965, p. 277, S.C.S. S.B. 284.

**3.** See § 564.011–2, RSMo 1978, which makes it a

matter in terms of the strict construction accorded to a criminal statute in order to protect the rights of one charged with its violation. The principal purpose of § 375.-141 is not to punish licensees or applicants, but to protect the public. To accomplish that purpose, its language should be given its ordinary meaning without regard to the niceties associated with the interpretation of criminal statutes. In *Theodoro v. Department of Liquor Control*, 527 S.W.2d 350, 353 (Mo. banc 1975), the court said, "That differences exist between the criminal process and the administrative process is well settled ... [T]he revocation of a liquor license is not a criminal prosecution but is in the nature of a civil proceeding, ... and as such, many rights ordinarily secured to criminal defendants are not available to licensees involved in revocation proceedings, ..." Against such backdrop, it is readily apparent that a person who gains access to private premises for the purpose of selling the owner a policy of insurance does so "in connection with [an] insurance transaction." If he uses the opportunity, as appellant did in this case, to gain knowledge of such matters as whether there is a burglar alarm, the presence and location of valuable items, and the best method of access to them for purposes of a subsequent burglary with or by persons he believes to be accomplices, he has practiced "fraud, ... deception, collusion, or conspiracy" within the ordinary meaning of those words.

Finally, the Administrative Hearing Commission also concluded that appellant's conduct "clearly demonstrates a lack of trustworthiness," which, in itself, authorizes revocation, suspension, or refus-

al of an insurance agent's license. § 375.-141. The evidence fully supports the AHC determination that appellant's conduct violated § 375.141–1(4) and (6). A violation of either would provide justification for the Director's refusal to issue a license to appellant. Cf. *Hughes v. State Board of Health*, 348 Mo. 1236, 159 S.W.2d 277, 280 (1942); *Rose v. State Board of Registration for the Healing Arts*, 397 S.W.2d 570, 577 (Mo.1965).

In his third point, appellant claims that he was entrapped by Caplin, Stehlin, and Brosmith and that his cooperation with them in formulating the plans for the burglaries was the product of coercion through their "implied threat of violence, injury or death."

With respect to appellant's argument that the evidence established the defense of entrapment, we note first that such defense is a creature of the criminal law. The proceedings with which we are here concerned are not criminal in nature; they are civil. *Theodoro v. Department of Liquor Control*, 527 S.W.2d 350, 353 (Mo. banc 1975). Appellant concedes that the statutory defense of entrapment set forth in § 562.066, RSMo 1978, is not available to him because that statute did not become effective until January 1, 1979. More accurately, it may be observed that § 562.066 is simply a codification of the pre-existing common law defense of entrapment which was not recognized as a defense in civil cases. As our Supreme Court said in *State v. Ward*, 361 Mo. 1236, 239 S.W.2d 313, 320 (banc 1951), which involved the right of the State to seize contraband, "... entrapment is a defense against a charge of crime and defendant is not being tried here for a

---

crime to attempt to commit an offense and provides in part, "It is no defense to a prosecution under this section that the offense attempted was, under the actual attendant circumstances, factually or legally impossible of commission ..." This court recently said in a case involving this statute, "defendant cannot be exonerated because facts unknown to him made it impossible to succeed... In eliminating impossibility as a defense, Missouri joins the vast majority of states which have rejected such a defense." *State v. Hunt*, 651 S.W.2d 587, 589

(Mo.App.1983). Similarly, § 564.016, RSMo, 1978, states that the offense of conspiracy is committed when "a person ... with the purpose of promoting or facilitating" an offense, agrees with another "that they or one ... of them will engage in conduct which constitutes such offense." Under that statute, it has been held that a person could be guilty of conspiracy to burglarize a house even though his "co-conspirators" were undercover agents who had no intent to commit the crime of burglary. *State v. Hohensee*, 650 S.W.2d 268, 276[4] (Mo.App.1982).

criminal offense." The defense of entrapment, either as recognized by common law or as defined by statute, was not available to appellant. A detailed analysis of the evidence which he claims establishes the defense is therefore not necessary. With respect to appellant's claim that he was "coerced" by fear of personal injury if he did not cooperate with the persons he believed to be burglars, suffice it to say that the AHC's rejection of such claims was fully warranted by the clear evidence of appellant's numerous, but unused, opportunities to terminate his relationship with them. Instead, he continued to meet and cooperate with them and made no effort to report the matters to law enforcement authorities. The point is without merit.

In his next point, appellant claims that it was error to permit the Director of the Division of Insurance to call as witnesses Mr. and Mrs. Miller, owners of the residence targeted by appellant for burglary, and Raymond Mueller, operator of the Trails West Store. This claim is predicated upon the fact that the names of these witnesses were not included among the names of witnesses furnished by the Director to appellant in response to an interrogatory from appellant. About ten days before the hearing, counsel for the Director attempted to supplement his answers to the interrogatories so as to include the witnesses' names; but, owing to an increase in postal rates which became effective at or about the time of mailing of the letter by certified mail, the letter arrived at the office of appellant's counsel with twenty-five cents' postage due. Although he was aware that the letter was from the Division of Insurance, counsel refused to accept the letter.

■ The principal authority cited by appellant in support of his position that the Director had a duty to answer interrogatories in the first place and then to supplement them is § 536.073, RSMo 1978. That section provides for the use of depositions in contested cases before administrative agencies, but is silent as to interrogatories. Indeed, the statute has been held not to provide authority for interrogatories in administrative proceedings. *Myers v. Moreno,* 564 S.W.2d 83, 87 (Mo.App.1978); *National Advertising Company v. State Highway Commission,* 549 S.W.2d 536, 541 (Mo.App.1977). While the rule making authority of the Administrative Hearing Commission provided by § 161.342, RSMo 1969 and RSMo 1978, may be broad enough to permit the Commission to promulgate a rule relating to interrogatories, no such rule was introduced at the hearing or made a part of the record. If such a rule exists, we may not take judicial notice of it, *Abbott v. Civil Service Commission of the City of St. Louis,* 546 S.W.2d 36, 37 (Mo.App.1976), unless it has been published in the Code of State Regulations. § 536.031, RSMo 1978.[4]

■ Nevertheless, we have examined the record and determined that any failure on the part of the Director to give notice to appellant that the witnesses would be called could have had no prejudicial effect on appellant. He had been given access to the police reports pertinent to the investigation; the witnesses were named therein and the relationship of each to the case was spelled out. Failure of the Director to specifically advise that they would be called could not have inhibited appellant's preparation for the hearing or the presentation of his case. That he had sold policies of insurance to the Millers and to the Trails West Store and entered upon the premises of each to do so was not a matter of controversy. The Administrative Hearing Commissioner did not abuse his discretion in permitting the witnesses to testify, and no prejudice to appellant has been demonstrated. See *Mueller v. Ruddy,* 617 S.W.2d 466, 478 (Mo.App.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 590 (1981).

4. 4 CSR 20-2.080(2), which relates to the Administrative Hearing Commission, provides: "Upon stipulation by both parties, written interrogatories may be used in the same manner as in civil actions in the circuit court." Appellant makes no contention that such a stipulation existed in this case.

On the occasions when appellant met with Sergeant Stehlin and Mr. Brosmith, Stehlin carried a concealed transmitter on his person. The conversations were transmitted to a receiver located in a nearby vehicle and recorded on tape under the supervision of Stehlin's partner, Detective Wayne Thornberry. At the hearing, the tapes were identified by Thornberry and Stehlin and admitted into evidence after Stehlin testified that he had listened to them and that they were the ones on which the conversations were recorded. Appellant objected to the admission of the tapes and now asserts that an inadequate foundation was laid for their admission. While the qualification of the tapes for admission into evidence was lacking in detail, we can perceive no possibility that their admission could have in any way been prejudicial to appellant. The tapes included the same matters testified to by Stehlin and Brosmith and in many respects by appellant himself. The cases cited by the appellant setting forth the factors ideally established prior to the admission of tape recordings are therefore not controlling, and we rule the point against appellant.

In his next point, appellant contends that "the decision of the Administrative Hearing Commissioner was not supported by substantial evidence." In support of this argument, appellant relies on six instances in which Sergeant Stehlin contradicted himself or in which his testimony differed from that of other witnesses called by the Director. These discrepancies, according to appellant, render Stehlin's testimony unworthy of belief and thus deprive the AHC's findings of necessary evidentiary support.

Our examination of these "discrepancies" reveals them to be either insignificant or nonexistent. An example of the latter is the fact that shortly before appellant's arrest Stehlin told him that Stehlin had burglarized the Miller house, but later "admitted on cross-examination that that was not a true statement." Appellant's observation

is correct, but overlooks the fact that Stehlin also explained that he told appellant that the loot from the burglary was in Stehlin's car so that appellant would accompany Stehlin to the parking lot. Stehlin used this pretext to avoid a disturbance in the store when he arrested appellant. Appellant did accompany Stehlin to the parking lot, Stehlin identified himself as a police officer, and placed appellant under arrest. Similarly, the claimed conflicts between Stehlin's testimony and that of other witnesses are, at most, inconsequential.

Where evidentiary support for findings of an administrative agency is attacked, a reviewing court reviews the whole record in the light most favorable to the decision, deferring to the agency on matters of weight to be given to conflicting evidence. *Gold v. Sharp, Kidde, Webb,* 564 S.W.2d 612, 614–615 (Mo.App.1978). While discrepancies in a witness' testimony might affect his credibility, they are for the agency to weigh, not this Court. *Hagan v. Paris & Osbourne Chevrolet,* 667 S.W.2d 1 (Mo.App.1984).

The Commission's findings of fact are amply supported by substantial and competent evidence in this record.

In his final point, appellant contends that the AHC erred in failing to grant his motion to strike paragraphs 12 and 13 of the answer filed by the Director to the appellant's consolidated complaint. Those paragraphs read as follows:

12. The Director of Insurance has found that Petitioner has violated Section 375.141.1, Paragraph 6, RSMo (1969) in that he has practiced or aided or abetted in the practice of fraud, deception, collusion or conspiracy in connection with an insurance transaction.

13. The Director of Insurance has found that Petitioner has violated Section 375.141.1, Paragraph 4, RSMo (1969) in that he has demonstrated a lack of trustworthiness or competence.

Appellant argues that these paragraphs violate Rule No. 4 of the Administrative Hearing Commission which requires the pleading of "facts," as opposed to conclusions.[5] Claiming that the above quoted paragraphs are conclusions, appellant reasons that they should have been stricken and all evidence tending to support them should have been excluded from the hearing. Had that been done, the Director would have shown no ground for the refusal of appellant's licenses.

Although we recognize the logic of appellant's argument, we are not persuaded by it and hold that the Administrative Hearing Commissioner did not abuse his discretion in refusing to strike the paragraphs or to exclude the evidence which supported them.

██ In any case involving the denial of a license by an agency included in the Administrative Hearing Commission Act, the answer filed by the agency frequently takes on a significance which surpasses that of an answer in the ordinary context of civil pleading. This type of proceeding is authorized by § 161.272, RSMo 1978, which is triggered when an agency "refuses to issue or renew a license of an applicant who has passed an examination for licensure or who possesses the qualifications for licensure without examination..." When such refusal occurs, the applicant is notified of his right to file a complaint with the AHC, in which complaint the applicant must "set out with particularity" his qualifications for the license he seeks. If, at the hearing, the applicant establishes his qualifications for examination for licensure or for licensure, the AHC issues "an appropriate order to accomplish such examination or licensure ..." § 161.302, RSMo 1978. Thus, unlike most civil proceedings where the basic issues are set out in the first pleading and effectively joined by a simple

denial, the issues in a refusal-to-license case often cannot be discerned with certainty until the agency files its answer stating the *reason* for its refusal. In such instance, the second pleading, the answer, serves the basic function of "notice" in the sense of due process to the applicant.

Thus, it would have been better practice for the Director to specify the facts upon which he relied, rather than the conclusions that appellant was guilty of conduct proscribed by § 375.141, supra. Nevertheless, appellant does not claim that his ability to prepare his case was in any way impaired by the lack of specificity in the answer; and, indeed, we do not believe it could be reasonably argued that any such impairment resulted. He had been indicted for the very acts which he knew formed the basis for the Director's refusal to license him; he had been dismissed as an agent by Allstate for those acts. In short, he was fully aware of the reasons underlying the Director's allegations in his answer and what was to be litigated at the hearing.

The Administrative Hearing Commission did not abuse its discretion in refusing to strike the referenced paragraphs of the answer.

Affirmed.

SIMON, P.J., and GAERTNER, J., concur.

---

5. Again, no such rule was made a part of the record. Our research reveals, however, that 4 CSR 20–4.050(1)(A) provides that the respondent in a proceeding before the AHC may file an answer and states, "The answer shall contain a short and concise statement of those facts which the respondent believes are true and relevant to the issues raised in the complaint."